# Supreme Court of Florida

_____

No. SC2024-1721

_____

**IN RE: CERTIFICATION OF NEED
FOR ADDITIONAL JUDGES.**

December 12, 2024

PER CURIAM.

Consistent with the process set out in article V, section 9 of the Florida Constitution, this opinion addresses the need to increase or decrease the number of judges in fiscal year 2025-26 and certifies our "findings and recommendations concerning such need" to the Florida Legislature.[1] We certify the need for 23

---

1. Article V, section 9 of the Florida Constitution provides in pertinent part:

> **Determination of number of judges.**—The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial

additional circuit court judgeships and 25 additional county court judgeships, as identified in the appendix, as well as the need for two additional district court judgeships on the Sixth District Court of Appeal. We certify there is no need to decrease the number of circuit court judgeships, county court judgeships, or district court judgeships. However, we acknowledge excess judicial capacity in the Second District Court of Appeal and recommend that the Legislature address this excess capacity over time by reducing the number of statutorily authorized judgeships based on attrition, without requiring a judge to vacate his or her position involuntarily.

## I. TRIAL COURT JUDICIAL WORKLOAD ASSESSMENT

Under Florida Rule of General Practice and Judicial Administration 2.240, this Court assesses trial court judicial need "based primarily on the application of case weights to circuit and county court caseload statistics." The rule requires the Commission on Trial Court Performance and Accountability to "review the trial court workload trends and case weights and

circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need.

consider adjustments no less than every five years."  As noted in our certification opinion last year, this cyclical review was delayed due to the impacts of the Coronavirus Disease 2019 pandemic and jurisdictional threshold changes on the court data the Commission relies on to determine case weight adjustments.[2]  After those impacts subsided, the Court determined it was appropriate to conduct a trial court workload assessment to ensure the case weights—which had last been updated in 2016—accurately reflect the current judicial workload.

To advance this effort, the Court directed the Commission to "[m]anage and oversee all efforts needed to review, update, and extend Florida's trial court judicial workload model (case weights) to address recent developments in statutory and case law and other practices that impact judicial workload."[3,4]  The Office of the State

2.  *In re Certif. of Need for Add'l Judges*, 375 So. 3d 204, 205 (Fla. 2023).

3.  *In re Commission on Trial Court Performance and Accountability*, Fla. Admin. Order No. AOSC22-36 (July 28, 2022).

4.  This assessment builds upon our three previous efforts to evaluate trial court judicial workload.  *See Florida Delphi-based Weighted Caseload Project Final Report* (Jan. 2000), https://www.flcourts.gov/content/download/217995/file/DelphiF

Courts Administrator (OSCA) contracted with the National Center for State Courts (NCSC) to assist the Commission with the assessment. The NCSC has conducted judicial workload assessments in more than 30 states,[5] including two previous Florida assessments that resulted in final reports issued in 2000 and 2016.[6]

## A. Judicial Workload Assessment Methodology

The Florida courts system implemented a multi-phase methodology to assess the judicial workload of trial courts. The methodology was both quantitative and qualitative in nature and structured to allow for maximum circuit and county court judge

---

ullReport.pdf; Commission on Trial Court Performance & Accountability, *Judicial Resource Study Final Report* (2007), https://supremecourt.flcourts.gov/content/download/242776/file/ JRSReport_Introduction.pdf; *Florida Judicial Workload Assessment Final Report* (May 16, 2016), https://www.flcourts.gov/content/download/778447/file/Florida% 20Judicial%20Workload%20Assessment%20Final%20Report%2020 16.pdf.

5. *See* Workload Assessment, National Center for State Courts, https://www.ncsc.org/consulting-and-research/areas-of-expertise/court-management-and-performance/workload-assessment (last visited Nov. 4, 2024).

6. *See supra* note 4.

participation.[7]  A detailed discussion of the judicial workload assessment methodology follows.

In October 2022, OSCA contracted with the NCSC to conduct the trial court workload assessment.  An administrative order constituted a Judicial Needs Assessment Committee (JNAC) comprised of 23 judges representing every judicial circuit to oversee and guide the assessment.[8]  To help define the scope of the project and ensure its completion, the JNAC reviewed and approved all the methodological steps of the assessment.  Specific project elements the JNAC reviewed and approved included the determinations of a standard judge day and a standard judge year, identification of case- and non-case-related activities, delineation of case-type categories, administration of the time study process, administration of the quality adjustment process, assignment of final proposed

---

7.  Senior judges and quasi-judicial officers, including magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers, also participated in the assessment.  Capturing this workload helps document their important contribution to the resolution of cases and will inform the standards used to allocate quasi-judicial officers based on workload.

8.  *In re Trial Court Judicial Needs Assessment Committee*, Fla. Admin. Order No. AOSC22-77 (Oct. 20, 2022).

case weights, and selection of a qualifying judicial threshold methodology.

## B. Time Study and Quality Adjustment Process

The workload assessment was performed in two stages: first, a time study, and second, a quality adjustment process.[9]  The formal assessment process began with a one-month time study in which circuit and county court judges recorded their time spent on case- and non-case-related activities in a web-based application in five-minute increments.[10]  Statewide, 586 circuit court judges and 321 county court judges participated in the time study, a participation rate of 99 percent.

The time study provided an empirically grounded basis for analyzing judicial workload in each of Florida's trial courts, as it captured the actual amount of time judges spent on case- and non-case-related activity each day, including time spent handling cases

---

9.  *See Florida Judicial Workload Assessment Final Report* (June 2024), https://www.flcourts.gov/content/download/2438568/file/Judicial_Workload_Report_Final.pdf.

10.  The time study occurred from September 18 through October 15, 2023.

on and off the bench and any after-hours or weekend work. Separately, OSCA provided counts of filings by case-type category and court location. The NCSC used the time study and filings data to calculate preliminary case weights based on the number of minutes circuit and county court judges spent resolving cases within each case-type category.

The quality adjustment process, like those used in previous assessments, was designed to ensure that the final case weights for circuit and county court judges incorporate adequate time for case processing. This process included a statewide sufficiency of time survey and a structured quality review of the preliminary case weights by a set of experienced judges from across the state. The quality adjustment process served an important role in the workload assessment because the preliminary case weights derived from the time study reflected data collected during a one-month period only. This one-month period may not have captured the variability that can occur throughout the year in certain case-type categories or other factors affecting the time dedicated to handling case-related activities during that period. Additionally, the preliminary case weights did not account for whether sufficient time

was available to deliver quality performance. The quality adjustment process, therefore, provided an opportunity to refine the weights so they accurately allocate sufficient time for effective case processing.

All circuit and county court judges were asked to complete a sufficiency of time survey in October 2023. The survey asked judges about the amount of time currently available to perform various case-related and non-case-related tasks. Specifically, within certain case-type categories, judges were asked to identify tasks, if any, where additional time would improve the "quality of justice." The survey enabled judges to freely comment on their workload. Seventy-one percent of circuit court judges and seventy-three percent of county court judges completed the survey.

The second component of the quality adjustment process was a series of Delphi[11] quality adjustment group sessions with circuit and county court judges in April 2024. A Delphi process has been

---

11. The Delphi method is a structured iterative process for decision-making by a panel of experts; in this instance, judges. *See Delphi Method,* RAND Corporation, http://www.rand.org/topics/delphi-method.html (last visited Nov. 4, 2024).

used by each of Florida's three previous workload assessments.[12] During the current assessment, six Delphi groups, facilitated by NCSC staff and comprised of six to eight judges representing different circuit sizes, met to review and assess the preliminary case weights. Each group focused on one of the following divisions of court: circuit criminal, circuit civil/probate, family, juvenile, county criminal, or county civil. Thirty-seven judges participated, with each judge experienced in the division of court that was the focus of the group. Considering the preliminary case weights and the results of the sufficiency of time survey, the groups identified any case-type categories and activities where additional time may be needed to enhance performance and recommended corresponding adjustments to the preliminary case weights. The groups ultimately recommended case weight changes for 25 percent of the case-type categories.

Throughout the quality adjustment process, judges reported that many case-type categories are more complex now than during the previous assessment, thus requiring additional time. Examples

---

12. *See supra* note 4.

of the areas where judges believed more time would improve the overall quality of justice included the review and hearing of non-dispositive pretrial motions in circuit and county criminal cases; the review and hearing of dispositive pretrial motions in circuit civil cases; the preparation of findings and orders related to trials and final hearings in circuit family cases; and the hearing of cases involving pro se litigants and interpreters. Judges also indicated, among other things, that more time is needed for case management, particularly in civil cases.[13]

The JNAC and the Commission, in April and May 2024, respectively, approved the proposed case weights and the recommendations advanced by the NCSC in its final report. This Court adopted the proposed case weights in June 2024 and directed OSCA staff to use the revised case weights starting with the certification analysis for fiscal year 2025-26.

---

13. In 2021, this Court implemented differentiated case management requirements to promote the timely resolution of civil cases. *See In re Comprehensive COVID-19 Emergency Measures for Florida Trial Courts*, Fla. Admin. Order No. AOSC20-23, Amend. 10 (Mar. 9, 2021); *see also In re Amends. to Fla. Rules of Civ. Proc.*, 386 So. 3d 497, 500 (Fla. 2024); *In re Amends. to Fla. Rules of Civ. Proc.*, 49 Fla. L. Weekly S289 (Dec. 5, 2024).

## II. TRIAL COURT CERTIFICATION OF JUDICIAL NEED

As described above, the Court continues to use a verified objective weighted caseload methodology as a primary basis for assessing judicial need for the trial courts. Total annual workload is calculated by multiplying a three-year average of forecasted filings for each case-type category by the corresponding case weight, then summing the workload across all case-type categories. Each court's workload is then divided by a judge year value to determine the total number of full-time equivalent judges needed to handle the workload.

Judgeship needs applications submitted by the chief judges of the judicial circuits supplement the objective data. Those applications provide the chief judges with an opportunity to describe how secondary factors[14] are affecting the courts within their judicial circuits. The secondary factors identified by each chief judge reflect local differences in support of their requests for more judgeships or in support of their requests for this Court to not

---

14. Other factors that may be used in the determination of trial court judicial need are prescribed in Florida Rule of General Practice and Judicial Administration 2.240(b)(1)(B) and (c).

certify the need to decrease judgeships in situations in which the objective weighted caseload methodology alone would indicate excess judicial capacity.

We have examined case filing data, reviewed the secondary factors supplied by the chief judges as part of their judgeship needs applications, and used the final case weights from the workload assessment to evaluate judicial need. Applying this methodology and using an objective threshold for evaluating when judicial workload indicates a need for more or fewer judges, this Court certifies the need for 48 additional trial court judgeships statewide—23 in circuit court and 25 in county court. Our specific certifications for circuit and county court judges are set out in the appendix accompanying this opinion. We recommend no decrease in circuit court judgeships and no decrease in county court judgeships.

To arrive at our certifications, the Court accounted for the relative needs of each circuit and county court as reflected in the weighted caseload methodology, but we have not certified the need for the full complement of judges indicated by that methodology. Instead, based on several considerations, the Court has chosen to

adopt an approach that is more incremental but still reasonable and fair.

The Court recognizes that funding new judgeships is a significant investment, and we are mindful of the Legislature's challenge in addressing myriad state budget priorities with limited resources. Further, the court system's capacity to absorb additional judges at one time is limited by factors such as courthouse space, with expansion of courtrooms and chambers subject to the availability of county funding. The Court also recognizes that establishment of new judgeships results in operational and potential fiscal impacts for justice-partner entities such as the clerks of the circuit courts, state attorneys, and public defenders. Finally, the court system requires some time to establish workload trends using the newly adopted case weights. It is for this same reason that the Court is necessarily cautious about certifying the need to decrease judgeships, as we are not yet able to determine trends that would indicate a sustained surplus in judicial capacity.

The Court is committed to ensuring that the allocation of any additional resources to the judicial branch budget results in

operational outcomes that benefit users of the court system. Although there is not an increase in forecasted filings, the revised case weights resulting from the comprehensive trial court workload assessment demonstrate that many cases have become more complex and require additional judicial engagement and time to resolve—warranting additional judges. If the Legislature elects to fund the judgeships certified in this opinion as an initial step in addressing the increased workload of circuit and county courts, this Court will use the new case weights to monitor the impact of the new resources and evaluate outstanding need in subsequent certification opinions under article V, section 9 of the Florida Constitution.

## III. DISTRICT COURT OF APPEAL CERTIFICATION OF JUDICIAL NEED

In furtherance of our constitutional obligation to determine the State's need for additional judges in fiscal year 2025-26,[15] this opinion certifies the need for two additional district court judgeships on the Sixth District Court of Appeal. In accordance with Florida Rule of General Practice and Judicial Administration

_____

15. *See supra* note 1.

2.240(b)(2), the Court continues to rely on a verified, objective weighted caseload methodology—primarily based on the number of cases disposed—as the main criterion for evaluating judicial need in the district courts. This methodology also considers factors related to workload, efficiency, effectiveness, and professionalism as outlined in the rule.

## A. Sixth District Court of Appeal Judicial Need

The Sixth District requested two additional judgeships. In its request, the chief judge noted that the district court began its work on January 1, 2023,[16] with nearly 1,700 transferred cases from two other district courts, and that filings in the district court continue to grow. According to the chief judge, the current judge complement is insufficient to keep pace with this growing workload. Additionally, the district court is currently supported by a temporarily assigned appellate judge from a neighboring district court, an assignment that is not a long-term solution to the district court's workload challenges.

The chief judge of the Sixth District also noted that despite

_____

16. *See* §§ 35.01, .044, Fla. Stat. (2023).

high caseloads, the judges and staff have made every effort to properly execute their responsibilities. But they do so knowing that trying to absorb this increased workload limits the time available for the consideration of each case and the writing of opinions. This Court shares the concerns of the chief judge about the potential for negative effects resulting from continued high workload and strained judicial resources. We find the workload for the Sixth District and other secondary factors cited in the request from the chief judge persuasive.

## B. District Court of Appeal Excess Judicial Capacity

As addressed in previous certifications of need for additional judges,[17] the Court recognizes excess judicial capacity in the Second District Court of Appeal based on the addition of a sixth district, corresponding jurisdictional boundary changes in three existing districts, and the policy decision not to require judges to relocate. However, the Court continues to recommend that this excess capacity be addressed over time through attrition; therefore,

---

17. *See In re Redefinition of App. Dists. & Certif. of Need for Add'l App. Judges*, 345 So. 3d 703, 706 (Fla. 2021); *In re Certif. of Need for Add'l Judges*, 353 So. 3d 565, 568 (Fla. 2022); *In re Certif. of Need for Add'l Judges*, 375 So. 3d at 205, 207-08.

- 16 -

we do not certify the need to decrease any district court judgeships.

To address the estimated excess judicial capacity in the Second District, this Court recommends that during the 2025 Regular Session the Legislature consider enacting legislation that provides for a reduction in the number of statutorily authorized district court judgeships based on attrition and without requiring a judge to vacate his or her position involuntarily. Such legislation could specify that, upon each occurrence of an event that otherwise would have resulted in a vacancy in the office of judge of the Second District, the number of authorized judges shall be reduced by one. We recommend that eventually, after attrition, there be 13 judges authorized for the Second District.[18]

The goal of the Court's recommended approach, consistent with previous opinions, is to address excess district court judicial capacity without prematurely ending an existing judge's judicial career. This approach reflects the policy embodied in the 2022 law

---

18. The Court previously recommended that, after attrition, there be 12 judges authorized for the Second District. *See* Fla. SB 490 (2024) (died in Judiciary Committee) (proposed amendment to § 35.06, Fla. Stat.); Fla. HB 457 (died in Civil Justice Subcommittee) (same). After further analysis, the Court now finds that the appropriate target is 13 judges.

establishing the Sixth District and realigning the jurisdictional boundaries of the first, second, and fifth appellate districts.[19]

In recent years, the Court had noted excess judicial capacity within the First District Court of Appeal, based on the same factors articulated above for the Second District.[20]  However, the Court has since determined it would be prudent to continue to monitor the workload in the First District and recommend no additional changes to judgeships on that court at this time.  The weighted workload per judge is higher in the First District than in the Second District and is more closely aligned with the other four district courts.

## IV.  CONCLUSION

Having conducted both a quantitative and qualitative assessment of trial court judicial workload, we certify the need for 48 additional trial court judges, consisting of 23 in circuit court and 25 in county court, as set forth in the appendix to this opinion.  We also recommend no decrease in circuit court and county court

19.  *See supra* note 17.

20.  *See supra* note 17.

judgeships.

The recently completed judicial workload assessment was an extensive effort involving the participation of more than 900 trial court judges representing all 20 judicial circuits. The Court extends its sincere thanks and appreciation to all who participated in that assessment.

We certify the need for two additional judgeships in the Sixth District. Finally, we recommend legislation to reduce the number of statutorily authorized judgeships in the Second District based on attrition and without requiring a judge to vacate his or her position involuntarily, as noted in this certification.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.

Original Proceeding – Certification of Need for Additional Judges

# APPENDIX
## Trial Court Need

| Circuit | Number of Circuit Court Judges Certified | County | Number of County Court Judges Certified |
|---|---|---|---|
| 1 | 1 | Walton | 1 |
| 2 | 0 | N/A | 0 |
| 3 | 0 | N/A | 0 |
| 4 | 1 | Clay | 1 |
| | | Duval | 2 |
| | | Nassau | 1 |
| 5 | 3 | Hernando | 1 |
| | | Lake | 1 |
| | | Marion | 1 |
| | | Sumter | 1 |
| 6 | 0 | N/A | 0 |
| 7 | 2 | N/A | 0 |
| 8 | 0 | N/A | 0 |
| 9 | 1 | Orange | 1 |
| | | Osceola | 1 |
| 10 | 2 | Polk | 1 |
| 11 | 0 | Miami-Dade | 7 |
| 12 | 1 | Manatee | 1 |
| 13 | 0 | Hillsborough | 1 |
| 14 | 1 | Bay | 1 |
| 15 | 2 | Palm Beach | 2 |
| 16 | 0 | N/A | 0 |
| 17 | 0 | N/A | 0 |
| 18 | 1 | N/A | 0 |
| 19 | 1 | N/A | 0 |
| 20 | 7 | Lee | 1 |
| Circuit Total | 23 | County Total | 25 |